# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

DAWN McCLELLAND,

        Plaintiff,


v.                           **MEMORANDUM OF LAW & ORDER**
                                 Civil File No. 08-4945 (MJD/AJB)


LIFE INSURANCE COMPANY OF NORTH
AMERICA,

        Defendant.

_____

Bryan R. Feldaus, Phillip A. Cole, and Ronald L. Haskvitz, Lommen, Abdo, Cole, King & Stageberg, PA, and Daniel M. Homolka, Daniel M. Homolka, PA, Counsel for Plaintiff.

Daniel K. Ryan, Mark T. Berhow, Peter L. Crema, Jr., Shushanie E. Kindseth, and Thomas P. Kane, Hinshaw & Culbertson LLP, Counsel for Defendant.

_____

## I.      INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Summary

Judgment [Docket No. 75] and Defendant's Motion for Summary Judgment

[Docket No. 81]. The Court heard oral argument on July 30, 2010.

## II.     SUMMARY OF THE COURT'S OPINION

The Court grants Plaintiff's motion for summary judgment and denies Defendant's motion for summary judgment. At the root of this dispute is the fact that a layperson would unquestionably term Anthony McClelland's death an "accident." The evidence indicates that McClelland intended to reach his next destination. He did not intend or expect to die. Moreover, although he engaged in behavior that greatly raised his risk of serious injury of death – by driving a motorcycle, by not wearing a helmet, by speeding, and by drinking excessively – there is no evidence that these behaviors raised the risk to the level that a reasonable, similarly situated person would think that death or serious injury was highly likely. The statistics offered by Plaintiff demonstrate that a person in this situation is overwhelmingly likely to safely reach his destination, particularly when he is an experienced drinker. If LINA would like to exclude drunk driving crashes from its coverage, it can easily and clearly write such an exclusion. It is the insurer that must decide, and then clearly indicate, what its insurance will cover.

## III. BACKGROUND

Graco, Inc. ("Graco") sponsors a program of employee welfare benefits that includes a benefit upon the accidental death of a covered employee.

Defendant Life Insurance Company of North America ("LINA") issued group insurance policy no. OK 006177 (the "Plan"), which insured accidental death benefits under the program. LINA is the Plan fiduciary who decides claims. (Plan at 15.) The Plan is an Employee Benefit Plan as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1002(1). Anthony McClelland ("McClelland) worked as a machinist for Graco and was a participant in the Plan.

## A.    The Plan

McClelland elected family coverage for his accidental death benefit. When family coverage is elected, the Plan provides accidental death benefits covering both the employee and his covered family members, under the Plan's "Schedule of Benefits." (Plan at 5.) Under the Plan's "Schedule of Covered Losses" section, a "Loss of Life" is compensated by "100% of the Principal Sum." (Plan at 5.) McClelland elected $250,000 in insurance through the Plan. As such, the total amount of benefits in controversy is $250,000. McClelland named his wife, Plaintiff Dawn McClelland, as the sole beneficiary.

The Plan defines a "Covered Accident" as:

A sudden, unforeseeable, external event that results, directly and

independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:

1.     occurs while the Covered Person is insured under this Policy;
2.     is not contributed to by disease, Sickness, mental or bodily infirmity;
3.     is not otherwise excluded under the terms of this Policy.

(Plan at 8.)  The Plan defines a "Covered Loss" as:

A loss that is all of the following:

1.     the result, directly and independently of all other causes, of a Covered Accident;
2.     one of the Covered Losses specified in the *Schedule of Covered Losses*;
3.     suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*.

(Id.)

## B.    The Incident

According to the Accident Report, on October 27, 2007, McClelland was driving southbound on his motorcycle on Highway 169 near Baldwin, Minnesota.  At about noon, he crashed after unsuccessfully attempting to navigate a curve.  During the crash, he was thrown from his motorcycle, hit the ground, and suffered severe head injuries.  He was not wearing a helmet. McClelland died the next day as a result of his injuries.

The Hennepin County Medical Examiner's toxicology report states that

McClelland had a blood alcohol concentration ("BAC") of 0.203%. The report lists blunt force injury as the immediate cause of death and acute ethanol intoxication as a significant condition. The legal limit of intoxication for operating a vehicle in Minnesota is 0.08%. Minn. Stat. § 169A.20, subd. 1(5).

The roads were dry and the weather clear on the day of the incident. The police took the statements of several witnesses who saw McClelland immediately before the crash. These witnesses indicated that McClelland was driving at speeds in excess of 90 miles per hour. In addition, the witnesses indicated that McClelland lost control of his motorcycle when he hit the gravel shoulder of the road and that he was driving with another motorcycle and a Saturn was traveling closely behind him at the time of the crash. One witness also indicated that the deceased was possibly in a race with another motorcycle, speeding up, slowing down, and switching lanes. Another witness opined that it was windy, and the wind may have played some factor in the incident.

C.     **Events Preceding the Accident**

According to Dawn McClelland, on Friday, October 26, 2007, her husband returned home from his Graco shift at approximately 7:00 a.m. Dawn McClelland returned home from work at 6:00 p.m. that evening. Anthony

McClelland had a few mixed drinks, but was not intoxicated.

Dawn McClelland avers that, on the morning of Saturday, October 27, 2007, the McClellands woke up and Dawn McClelland got ready for work. Anthony McClelland showed her family photos on the internet and told her that he was going for a motorcycle ride because it was going to be a nice day. He stated that he intended to complete yard work with their son and tend to his garden that Saturday afternoon. Dawn McClelland then left for work. The McClelland's daughter, Kayleen, told Dawn McClelland that Anthony McClelland left on his motorcycle at approximately 9:00 a.m. or 9:30 a.m.

According to the affidavit of Bennett Wallace, McClelland then drove his motorcycle from his home to the home of Bennett Wallace in Zimmerman, Minnesota. He arrived at Wallace's house at 10:00 a.m. They talked for approximately one-half hour. During the visit, McClelland did not have anything to eat or drink. Wallace testified that McClelland showed no signs of alcohol, such as the smell of alcohol, slurred speech, difficulty walking, or unruliness. McClelland's balance and movements were normal, and he had a normal work demeanor.

Wallace avers that McClelland told him that he had needed directions to

Wallace's home, so he had stopped at the Longhorn Café in Zimmerman, Minnesota, but had been unable to get directions. McClelland also told him that he had asked a man parked at the Holiday gas station next to the coffee shop for directions. McClelland also told Wallace that he had asked a Sherburne County Sheriff for directions.

McClelland left Wallace's home and drove to the home of his brother-in-law, Daniel Litchy, in Long Siding, Minnesota. McClelland arrived at Litchy's home around 11:00 a.m. McClelland visited with both Litchy and his son, Peter Denardo. Litchy and Denardo testified that McClelland was in a good mood, did not smell of alcohol, did not have slurred speech, did not have bloodshot eyes, exhibited normal walking and balance, and did not stumble or stagger. McClelland told them that he was headed home and left their house at approximately 11:30 a.m. Shortly thereafter, Litchy heard the police and later learned that McClelland had been killed in a motorcycle accident near Litchy's home.

### D. McClelland's Background

#### 1. Criminal History

In 1995, McClelland was charged with driving under the influence, child

endangerment, and speeding and pled guilty to driving under the influence and child endangerment.  As part of his case, he underwent a chemical dependency evaluation.

In 1997, McClelland was charged with driving under the influence and gross misdemeanor over 0.10.  He pled guilty to gross misdemeanor over 0.10.

In 2005, McClelland was charged with obstruction of legal processes, failure to obey the lawful order of a police officer, and disorderly conduct.  He pled guilty to disorderly conduct.

### 2.    Personal Characteristics

On the date of the accident, McClelland was 54 years old.  McClelland and Dawn McClelland were married in 1984.  They planned to celebrate Dawn McClelland's birthday on December 30, 2007, in Las Vegas.  McClelland had ridden motorcycles since he was sixteen.  He maintained his own motorcycles and had built a British motorcycle from parts.  The motorcycle that he was riding on the day of the accident was a Harley Davidson UltraGlide, which he had purchased in 2007.  He had ridden that motorcycle to the motorcycle rally in Sturgis, South Dakota, in August 2007 with his brothers and planned to return to Sturgis in August 2010.

### E.      The First Denial of Benefits

As recounted in the Court's previous summary judgment order: Following McClelland's death, Plaintiff submitted a claim to LINA for death benefits. LINA investigated the claim on behalf of the Plan, and in the process reviewed the claim form, death certificate, accident report, and toxicology report. On March 19, 2008, LINA denied the claim. The denial letter stated that LINA's denial was based upon the position that McClelland's death was not a "Covered Accident" because it was "foreseeable" due to his intoxicated state at the time of the crash. LINA asserted that the crash was "the foreseeable consequence of his actions" of "driving a motor vehicle while intoxicated" because "[t]he hazards of drinking and driving are widely known and publicized," the state of Minnesota has enacted laws to protect the public against such conduct, and all licensed drivers in Minnesota are on notice of these laws and the potential consequences of drunk driving. The denial letter also notified Plaintiff of her right to appeal the denial.

On May 6, 2008, Plaintiff filed an appeal of LINA's denial. In a June 23, 2008 letter, LINA upheld its denial. The second denial letter again stated LINA's position that the crash was not a "Covered Accident" because it was "foreseeable." Additionally, the June 23 denial stated LINA's second position

that McClelland's death fell under the policy's "self-inflicted Injury" exclusion, as it was a result of the decedent's intentional actions – drinking and driving.

**F.     Initial Proceedings Before this Court**

On August 4, 2008, Plaintiff mailed a Summons and Complaint against LINA to the Minnesota Department of Commerce.  The Complaint sought to recover benefits under various provisions of ERISA and also asserted a breach of contract claim.  On August 15, 2008, LINA removed the case to this Court based on federal question jurisdiction.

On March 19, 2009, Plaintiff's counsel filed an Amended Complaint asserting a claim for benefits under the Plan for Kayleen and Genevieve McClelland, as well as for Dawn McClelland, as a result of Anthony McClelland's death.  [Docket No. 33]

**G.     The Court's October 29, 2009 Order**

On October 29, 2009, this Court issued an Order ruling on the parties' cross motions for summary judgment.  The Court held that Dawn McClelland was the sole beneficiary under the Plan and that the self-inflicted injury exclusion did not apply.  It further held LINA had employed an unreasonable definition of the term "accident" when it decided the claim:

Given correct application of the <u>Wickman</u> standard – requiring death to be reasonably viewed as "highly likely to occur" – it is questionable whether Mr. McClelland's death would be excluded from coverage based on the risks inherent in driving while intoxicated. However, under ERISA's deferential standard, the Court must first allow LINA the opportunity to analyze the McClelland claim under the correct standard, rather than making its own determination regarding the merits of the McClelland claim . . .

(Oct. 29, 2009 Order at 26-27 (citations omitted).)

The Court remanded Dawn McClelland's claim for benefits to LINA for

reconsideration. Specifically, the Court ordered:

Because LINA applied an unreasonable definition of accident, and one that differs from its litigation position, the appropriate remedy is for the Court to remand this matter to LINA to reconsider the McClelland claim under the correct standard. On remand, LINA must make an individualized determination of whether Mr. McClelland's death resulted from an accident, as defined by <u>Wickman</u>. LINA cannot employ a per se rule regarding drunk driving, but must make a determination regarding this particular case. <u>See</u> <u>Danouvong</u>, 2009 WL 3166705, at *11 (remanding similar case to LINA and instructing that "LINA's conclusion regarding Plaintiff's entitlement to benefits must apply its interpretation of the Policy to the facts and circumstances of [the decedent's] [] collision, describing which, and why, particular facts in the record support, detract from, or are irrelevant to its conclusion") (citation omitted).

(<u>Id.</u> at 27-28.)

Under <u>Wickman</u>, an event is an accident if the decedent did not

subjectively expect to suffer "an injury similar in type or kind to that suffered"

11

and the suppositions underlying that expectation were reasonable.  <u>Wickman v.</u>

<u>Northwestern Nat'l Ins. Co.</u>, 908 F.2d 1077, 1088 (1st Cir. 1990) (citation omitted).

"The determination of what suppositions are unreasonable should be made from

the perspective of the insured, allowing the insured a great deal of latitude and

taking into account the insured's personal characteristics and experiences."  <u>Id.</u>

(citations omitted).  If the evidence is insufficient to determine the decedent's

subjective expectation, the question is then whether "a reasonable person, with

background and characteristics similar to the insured, would have viewed the

injury as highly likely to occur as a result of the insured's intentional conduct."

<u>Id.</u> (citation omitted).

> ### H.    Proceedings on Remand

Following the Court's October 29 Order, Plaintiff supplemented the

Administrative Record regarding the fatalities associated with driving while

intoxicated and affidavits regarding McClelland's behavior the morning of his

death.  LINA conducted additional investigation.  Both parties submitted reports

from alcohol intoxication experts.

> #### 1.    Lowell Van Berkom Report

Plaintiffs submitted an expert report by forensic toxicologist Lowell Van

Berkom.  Van Berkom opined that, based on the witness statements provided by Plaintiff, it was highly unlikely that McClelland had time to consume the quantity of alcoholic beverages necessary to reach the blood alcohol concentration reported by the medical examiner.  However, he admitted that it was possible that McClelland could have rapidly consumed all of the alcoholic beverages after leaving Litchy's home at 11:30 a.m., such that his BAC would match the medical examiner's report.  Van Berkom opined "Therefore, the possibility that the blood sample was tainted at collection time should be considered."  He noted that tainting could occur if alcohol was used as a disinfectant during the blood draw or if wounds had been swabbed with alcohol before the blood draw.

Because Van Berkom demonstrated no firsthand knowledge of the BAC test, performed no testing himself, and admitted that it was possible for McClelland to consume sufficient alcohol to reach the resulting BAC, even if he did not begin drinking until after leaving Litchy's home, the Court concludes that Van Berkom's questions regarding the accuracy of the BAC test is speculative.  At a minimum, LINA was reasonable in discounting the suggestion of a flawed BAC test.

### 2. Berman Report

On remand, LINA hired Dr. Mitchell Berman to analyze this case. Berman is a clinical psychologist who specializes in aggressive and self-injurious behavior in humans. He examined the administrative record and was asked to render an opinion regarding McClelland's subjective expectation of injury and death and the reasonableness of that expectation, taking into account his personal characteristics, history, and experience, or, if that analysis was not possible, to provide an objective analysis of a reasonable person's expectation of injury and death, considering a background and characteristics similar to that of McClelland.

Berman opined that McClelland had the expectation that his conduct was highly likely to result in serious injury or death. He opined that he could not make a direct assessment of McClelland's subjective expectations, but concluded that certain general inferences were reasonable in light of McClelland's background and characteristics and the circumstances surrounding his death.

Berman based his opinion on the facts that McClelland was speeding at 90 miles per hour, chose not to wear a helmet, was weaving in and out of traffic, had a BAC of .203, had no history of delusions or drugs which might have impaired

his expectation of potential injury, and had a history of driving under the influence of alcohol. Furthermore, driving skills deteriorate once BACs exceed .05; fatal crash risk increases after a BAC of .05, with an 11 times greater risk of dying as BACs approach .10; only a small percentage of adults of McClelland's age and race drive after consuming alcohol; persons in his age group generally believe that it is not safe to drive at a BAC of greater than .03; it is likely that McClelland was exposed to information about the risks of driving after consuming alcohol during probation periods for his alcohol-related vehicular convictions; there has been ubiquitous public information regarding the dangers of driving while intoxicated; as an individual with a history of alcohol problems, McClelland would tend to engage in greater risk-taking behavior; and intoxication makes a person more likely to engage in risky behavior, despite awareness of the potential negative consequences. Berman concluded that Plaintiff's arguments and logic failed to take into consideration important factors surrounding McClelland's death.

### 3.    LINA Decision on Reconsideration

On January 27, 2010, LINA issued its decision, that the death was not a covered accident under <u>Wickman</u> and denied the claim.

## I.  Current Procedural Posture

On February 12, 2010, Plaintiff filed her Second Amended Complaint

against LINA.  [Docket No. 72]  The Second Amended Complaint alleges First

Cause of Action: 29 U.S.C. § 1132(a)(1)(B), to recover benefits due; Second Cause

of Action: 29 U.S.C. § 1132(a)(3)(A) and (B), to obtain equitable relief; Third Cause

of Action: 29 U.S.C. § 1104(a)(1)(A) and (B), to obtain relief based on breach of

fiduciary duties; Fourth Cause of Action: 29 U.S.C. § 1104(a)(1)(D), to obtain relief

based on breach of fiduciary duties; and Fifth Cause of Action: Attorney's Fees

and Costs, 29 U.S.C. § 1132(g)(1).

The parties have now filed cross motions for summary judgment.

## IV.  DISCUSSION

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56©); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

16

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

**B.      Standard of Review Under ERISA**

The Court set the applicable standard of review in its previous Order: abuse of discretion.  Under ERISA, a plan beneficiary has the right to judicial review of a benefits determination.  See 29 U.S.C. § 1132(a)(1)(B).  When a policy provides the plan administrator with discretionary authority to determine eligibility for benefits, the abuse of discretion standard generally applies.  Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).  The parties do not dispute that the Plan grants LINA discretionary authority in this case.

"Under the abuse of discretion standard, [the Court] look[s] to see whether [the plan administrator's] decision was reasonable.  In doing so, [the Court] must determine whether the decision is supported by substantial evidence, which is more than a scintilla, but less than a preponderance."  Willcox v. Liberty Life Assurance Co. of Boston, 552 F.3d 693, 700 (8th Cir. 2009) (citation omitted).

There is an inherent conflict of interest when a plan administrator acts as both the decision-maker in a claim determination and the payer of benefits.  Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008).  However, the Supreme

Court held that the presence of such a conflict of interest does not change the standard of review from abuse of discretion. See id. at 2350. Instead, a conflict should be weighed as a factor in determining whether there is an abuse of discretion. Id. at 2351. All relevant factors, including the presence of a conflict of interest, should be used as a tiebreaker when all other factors are "closely balanced." Id. A conflict of interest should be given greater importance if a party can show that "circumstances suggest a higher likelihood that it affected the benefits decision." Id.

**C.      Interpretation of "Accident" Used By LINA on Remand**

In a case, such as this one, "where a benefit plan gives the administrator discretion to interpret uncertain terms in the plan," courts usually begin their analysis "by considering whether the administrator's interpretation of the terms is 'reasonable.'" King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994, 1001 (8th Cir. 2005) ("King II").

> In sum, an administrator with discretion under a benefit plan must articulate its reasons for denying benefits when it notifies the participant or beneficiary of an adverse decision, and the decision must be supported by both a reasonable interpretation of the plan and substantial evidence in the materials considered by the administrator.

Id. at 1000.

The Court applies a five-factor test to determine whether the administrator's interpretation of the plan was "reasonable." Finley v. Special Agents Mut. Benefit Assoc., Inc., 957 F.2d 617, 621 (8th Cir. 1992). The Finley factors are:

> (1) whether the interpretation is consistent with the goals of the plan, (2) whether the interpretation renders any plan language meaningless or inconsistent, (3) whether the interpretation conflicts with the requirements of the ERISA statute, (4) whether the administrators have interpreted the words at issue consistently, and (5) whether the interpretation is contrary to the clear language of the plan.

Buttram, 76 F.3d at 901 (citing Finley, 957 F.2d at 621). While the Finley factors inform a court's analysis, the dispositive principle remains that a court may not replace a reasonable interpretation of a plan by an administrator with an interpretation of its own. King II, 414 F.3d at 999.

In the Court's previous Order, it held that LINA's interpretation of the term "accident" – to exclude all reasonably foreseeable events – violated the first four Finely factors and that the fifth factor did not apply. (October 29 Order at 19-26.) The Court ordered LINA to employ the Wickman standard. As noted above, under Wickman, an event is an accident if the decedent did not

19

subjectively expect to suffer "an injury similar in type or kind to that suffered" and the suppositions underlying that expectation were reasonable. <u>Wickman</u>, 908 F.2d at 1088 (citation omitted). "The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." <u>Id.</u> (citations omitted). Because the Court must give the insured wide latitude, the <u>Wickman</u> court noted that the following highly risky behaviors resulted in accidental deaths: "where man fell off top of moving car; he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip;" "where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself;" and where "professional diver [died] after diving off the Coolidge Dam [and] previously had completed the same dive without injury." <u>Wickman</u>, 908 F.2d at 1088 (citations omitted).

If the evidence is insufficient to determine the decedent's subjective expectation, the question is then whether "a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." <u>Id.</u> (citation

omitted).

The question before the Court now is whether LINA reasonably applied the <u>Wickman</u> interpretation to the facts of this case.  <u>Donaho</u>, 74 F.3d at 900.

**D.  Whether LINA Reasonably Applied the <u>Wickman</u> Standard to the Facts of this Case**

    **1.  Whether LINA Analyzed McClelland's Subjective Expectations Based on His Personal Characteristics and the Circumstances of the Accident**

LINA did not correctly follow the <u>Wickman</u> standard on remand, because it did not reasonably analyze McClelland's subjective expectations and the reasonableness of the suppositions underlying those expectations.  Nor did LINA reasonably analyze whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.  Rather, LINA again employed a per se exclusion for deaths resulting from driving while intoxicated.

In its January 27 denial letter, LINA, relying on Berman, concluded that it was "difficult to perform a direct assessment of Mr. McClelland's subjective expectations regarding severe injury or death on October 27th, 2009."   Therefore,

it relied upon generalizations, reasoning that "general inferences regarding this type of behavior are reasonable" based upon the fact that "individuals with alcohol history and backgrounds similar to Mr. McClelland tend to behave more impulsively and take greater risks, even when not drinking, than those without such a history;" "alcohol's effects on the fear response and decision making may increase the likelihood of risk taking behavior by decreasing a person's motivation to avoid negative consequences;" and the absence of "evidence that Mr. McClelland, at the time of the motorcycle crash, was delusional and thus felt that he might be immune to the consequences of his actions." LINA and Berman focused solely on McClelland's race, sex, age, and prior DUI convictions.

LINA further concluded

Based upon both Mr. McClelland's subjective and objective expectations regarding his conduct on October 27, 2007, namely operating a vehicle which offers limited protection from injury in the event of a crash, operating said vehicle without head protection, operating said vehicle at speeds in excess of 90 miles per hour, operating said vehicle to weave in and out of traffic, and operating said vehicle at a BAC of two and a half times the legal limit for operating a vehicle in the State of Minnesota, it is reasonable to believe that his death was foreseeable and highly likely to occur as the result of his own voluntary actions.

While these factors may be relevant to show that McClelland's judgment

was impaired and that he engaged in behavior that society rightly deems unacceptably risky, they do not approach evidence that McClelland intended, expected, or reasonably should have expected, to die. LINA wholly disregarded important characteristics about McClelland and the incident in making its analysis. McClelland was an experienced motorcycle rider and not an inexperienced drinker. On October 27, McClelland had plans to complete yard work the afternoon after his accident and showed no obvious signs of intoxication in the hours leading up to his accident. Based on the evidence before LINA, McClelland's behavior on October 27 was normal, and he had no problems with balance or orientation. LINA did not mention McClelland's plans for the rest of the day, his purpose for riding that day, or his seeking directions from sheriff. There was overwhelming evidence that subjectively, McClelland intended to ride his motorcycle to visit friends and then return safely home to do yard work. See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 813 n.22 (10th Cir. 2010) (providing that, even under the Wickman "highly likely" standard, "there is still nothing in the record to suggest that it was actually 'highly likely' that [the deceased], driving in the early morning darkness, with a .227% BAC and twenty

miles above the speed limit, would die in a rollover crash, or perceive that his

death under those circumstances would be 'highly likely'").  The only reasonable

interpretation of the evidence is that McClelland subjectively did not expect to

die.

LINA further argues that, under Wickman, even

[i]f the fact-finder determines that the insured did not expect an
injury similar in type or kind to that suffered, the fact-finder must
then examine whether the suppositions which underlay that
expectation were reasonable.  This analysis will prevent unrealistic
expectations from undermining the purpose of accident insurance.

Wickman, 908 F.2d at 1088 (citations omitted).  As the Court has noted, Wickman

provides wide latitude to the decedent's perspective, such that not expecting

injury from diving off the Coolidge Dam is reasonable if the decedent had

previously completed a successful dive, and falling off the top of the car is

accidental if the decedent had previously performed the stunt.  Id.

LINA argues that it is common knowledge that motorcycles provide much

less protection; therefore, a reasonable person would be more careful (including

wearing a helmet) and drive at safer speeds on a motorcycle than in a car.  LINA

points out that McClelland chose not to wear a helmet and to speed, while

weaving in and out of traffic and intoxicated at almost three times the legal limit

in Minnesota. LINA concludes that a reasonable person would expect death or serious injury to be highly likely to occur. It argues that McClelland, in particular, was in a good position to understand these risks based on his previous DUIs. Also, a history of alcohol misuse is associated with a tendency to engage in risky behavior, despite knowing of the potential risk.

LINA points the Court to other appellate decisions, such as Stamp v. Metropolitan Life Insurance Co., for the proposition that driving drunk with a BAC of approximately .265 (McClelland's BAC was .203) and crashing in a single-vehicle fatality is not an accidental death. 531 F.3d 84, 88-90 (1st Cir. 2008). The Court concludes that Stamp does not support LINA's position. In Stamp, the majority noted that the decedent was only a sporadic drinker; therefore, the administrator's medical department opined that his BAC would have more of an effect on him than it would on a chronic drinker. Stamp, 531 F.3d at 91. The First Circuit concluded, "In Wickman terms, it is not arbitrary and capricious to conclude that a reasonable person would view death or serious injury as a highly likely outcome of driving while so drunk that one may need help to stand or walk and is likely to black out." Id. (footnote omitted).

In contrast, it is undisputed that McClelland was an experienced drinker.

The evidence in the record is that McClelland was behaving normally up until one half hour before his accident. There is no evidence he needed help walking or blacked out.  An individual who drinks regularly would be less likely to be affected by a high level BAC.  See Stamp, 531 F.3d at 91; Courtney v. Zurich Am. Ins. Co., No. 8:07CV12, 2008 WL 189836, at *7  (D. Neb. Jan. 22, 2008) (noting that although decedent's BAC of .5% could be lethal, decedent was a "heavy drinker" and evidence in the record showed she was in a good mood before the accident). McClelland's actions were not the equivalent of "driving while so drunk that one may need help to stand or walk and is likely to black out."  Rather, he was an experienced drinker who showed no obvious effects of intoxication and an experienced motorcyclist, riding his motorcycle in daylight hours and clear conditions.  Not only did he not subjectively expect to be injured, for a person with his characteristics, that subjective expectation was reasonable.

> **2.      The Statistics Regarding the Risk of Driving While Intoxicated**

Under Wickman, an understanding that driving under the influence is risky does not automatically translate to the expectation that one is highly likely to die or be seriously injured if he engages in the conduct.

Accepting that '[t]he dangers of drinking and driving are well known and widely publicized' and 'such conduct . . . represent[s] a recognized and unacceptable danger to the motoring public . . . as LINA asserted in denying Plaintiff's appeal, does not mean accepting that car collisions are <u>foreseeable</u> when the driver is intoxicated, a statistically unfounded position.

<u>Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of N. Am.</u>, 659 F. Supp. 2d 318, 329 (D. Conn. 2009).  <u>See also</u> <u>Courtney</u>, 2008 WL 189836, at *7 (holding that a reasonable person with the background and characteristics similar to those of the deceased would not have viewed injury and death as highly likely to occur as a result of operating a motor vehicle with a BAC of .50).

LINA and Berman's statistics simply show that driving a motorcycle while intoxicated is risky and that persons with a history of drinking are more likely to be familiar with that risk.  LINA did not address Plaintiff's statistics showing that death or serious injury is not <u>highly</u> <u>likely</u> to result from operating a motorcycle while intoxicated.

Based on the evidence that Plaintiff presented to LINA, in Minnesota, in 2008, there were 135 fatalities involving a BAC of .08 or higher, compared to 35,000 arrests for driving while intoxicated, which is approximately a 0.4% death rate and does not take into account the number of times motorists drive while

intoxicated and are not arrested.  Survival is a overwhelmingly likely result of

operating a motorcycle while intoxicated, and death is a statistically unlikely

event.  See also LaAsmar, 605 F.3d at 809, 812 (holding death was a covered

accident when insured died in one-car crash while speeding, not wearing a seat

belt, and driving with BAC of .227 and noting that "statistically, it is not

reasonably foreseeable that a person driving drunk will be seriously injured or

killed") (citations omitted); Kovach v. Zurich Am. Ins. Co., 587 F.3d 323, 337 (6th

Cir. 2009) ("Driving while intoxicated concededly makes a collision 'more likely'

to occur than if the driver was not intoxicated, but this does not mean that a

collision under such circumstances is 'highly likely.'"); West v. Aetna Life Ins.

Co., 171 F. Supp. 2d 856, 904 (N.D. Iowa 2001) ("Although alcohol was a factor in

a significant percentage of fatalities, common sense and logic suggest that if it

were indeed "highly likely" that a person driving while intoxicated would suffer

a serious injury or be killed, the number of alcohol-related fatalities in 1996, in

light of the number of arrests for driving under the influence [more than one

million], should have been vastly higher than 17,218.  What 'common knowledge'

should actually tell a person driving while intoxicated is that he or she is far more

likely to be arrested for driving while intoxicated than to die or be injured in an

alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed.").

### 3. Meaning of "Highly Likely" and the Russian Roulette Example in <u>Wickman</u>

LINA makes much of the fact that, in <u>Wickman</u>, the First Circuit held that death from Russian roulette is not an accident, even though there is only a 1 in 6 chance of death or injury with each game. The Court finds the Russian roulette example wholly distinguishable from the facts currently before the Court. Although there is only a 16% chance of dying when playing Russian roulette, the activity is carried out with the sole purpose of undertaking the risk of death, so there is a subjective intention to expose oneself to a high risk of death in an activity with no social utility. In contrast, driving a motorcycle, even while intoxicated, speeding, and without a helmet, has the social utility of transporting one to one's destination and is undertaken for purposes other than facing the risk of death. <u>See</u> <u>LaAsmar</u>, 605 F.3d at 807 n.15 ("Although statistics suggest that a person playing Russian roulette ordinarily has a one-in-six chance of dying (assuming they played just once), we are confident that a reasonable person would, nonetheless, conclude death while playing Russian roulette is not an

accident.  This is no doubt due in part to the fact that a person engaged in

Russian roulette is knowingly undertaking the risk of death solely for the sake of

risk itself.") (citations omitted); <u>Kovach</u>, 587 F.3d at 338 (noting that "[p]laying

Russian roulette has zero social utility, whereas using motorized transportation

to move about has a very high level of social utility") (citation omitted).

## V.     CONCLUSION

Plaintiff is entitled to benefits.  LINA abused its discretion by denying her

claim.  The evidence before LINA demonstrates that McClelland did not

subjectively expect to suffer death or severe injury.  The evidence also shows that,

from the point of view of an experienced drinker and motorcyclist, this belief was

reasonable.  Moreover, the evidence demonstrates that a reasonable person with

McClelland's characteristics would not have thought death was highly likely to

occur.  There is no other reasonable interpretation of the evidence and the

<u>Wickman</u> standard.

The Court grants Plaintiff's motion for summary judgment and denies

Defendant's motion for summary judgment.  At the root of this dispute is the fact

that a layperson would term McClelland's death a "drunk driving **accident**."

The evidence indicates that McClelland intended to reach his next destination

and go about his day, working in the yard at home.  He did not intend or expect

to die.  Moreover, although he engaged in behavior that greatly raised his risk of

serious injury of death – by driving a motorcycle, by not wearing a helmet, by

speeding, and by drinking excessively – there is no evidence that these behaviors

raised the risk to the level that a reasonable, similarly situated person would

think that death or serious injury was highly likely.  The statistics offered by

Plaintiff, and noted in other cases such King II, show that, even when driving

drunk, the insured is overwhelmingly likely to safely reach his destination,

particularly when he is an experienced drinker.

In its October 29 Order, the Court fully explained the importance of

enforcing the layperson's commonsense view of "accident" and fulfilling the

purpose of accident insurance.  See, e.g., King II, 414 F.3d at 1008 ("[P]eople buy

accident insurance to protect themselves against their own negligence – that is,

voluntary but imprudent conduct that may with reasonable foreseeability result

in injuries or even death.") (citation omitted) (Bright, J., concurring); id. at

1008-09  ("By excluding from accident coverage any injury that was reasonably

foreseeable, the plan administrator's decision would seem to make nonsense of

the concept of an 'accident.'  . . .  It would deceive employees – attracting them to

a job with the promise of benefits that turn out, when they are claimed, to be illusory.").  "[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy."  Kovach, 587 F.3d at 332-33 (citation omitted).  These same policy arguments apply here to show that LINA abused its discretion in denying Plaintiff's claim based on a per se exclusion for drunk driving deaths.

As the Sixth Circuit noted, if LINA would like to exclude drunk driving crashes from its coverage, it can easily and clearly write such an exclusion:

> The solution for insurance companies . . . is simple: add an express exclusion in policies covering accidental injuries for driving while under the influence of alcohol, or for any other risky activity that the company wishes to exclude.  Policyholders would thus be able to form reasonable expectations about what type of coverage they are purchasing without having to make sense of conflicting bodies of caselaw that deal with obscure issues of contractual interpretation.  Had [the insurer] included such an exclusion in [the] first place, this litigation would have been entirely unnecessary.

Kovach, 587 F.3d at 338.  See also LaAsmar, 605 F.3d at 813-14 ("If [the insurer] wants to exclude from its AD & D coverage vehicle wrecks caused by its insured's drunk driving, it can certainly do so by drafting the language of its Plan clearly to say so. . . .  It is ultimately the insurer that must decide, and then

clearly articulate, what its AD & D insurance will cover. Moreover, if the insurer clearly and expressly addressed these matters in the terms of the plan, the insured would not have to guess at the coverage he has purchased.") (citations and footnote omitted).

Finally, although Plaintiff briefly mentions attorney fees, there has been no argument on that issue. The Court will not address the issue of attorney fees unless Plaintiff files a motion seeking such an award.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 75] is **GRANTED**.

2.    Defendant's Motion for Summary Judgment [Docket No. 81] is **DENIED**.

3.    Plaintiff is awarded $250,000 in accidental death benefits payable by Defendant Life Insurance Company of North America pursuant to the Group Accident Insurance Policy.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 30, 2010        s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court